IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

SUPERIOR LEASING, LLC; et al.,                     Civil No.  04-3099-CO

            Plaintiffs,                          ORDER AND
                                   FINDINGS AND RECOMMENDATION

   v.

KAMAN AEROSPACE CORPORATION,

            Defendant.


COONEY, Magistrate Judge:

This action was removed from state court on the basis of diversity. Plaintiffs allege  claims for strict products liability under ORS 30.900 et seq., negligence, breach of statutory duty, and post-sale duty to warn.  Plaintiffs seek incidental and consequential damages, and statutory costs and disbursements.  This Court has jurisdiction pursuant to 28 U.S.C. § 1332 (see #59).  Before the Court are defendant's motion for summary judgment or, in the alternative, motion for partial summary judgment (#12),  plaintiffs' cross-motion for partial summary judgment (#22), and plaintiffs' motion for leave

to file amended complaint (#72).  Following argument on the parties' cross-motions for summary judgment, the Court requested supplemental briefing from the parties on specified issues, and heard further argument at a supplemental hearing.

## I.  DISCUSSION

### A.  Motions for summary judgment

1. Facts

The Court makes the following findings of fact:

Superior's claims arise from a fatal helicopter accident of July 25, 2003, involving Kaman K-1200 "K-MAX" Helicopter N314KA.[1]  (Compl. ¶¶ 8-16.)

Kaman manufactures and sells the K-1200 model helicopter, also known as the K-MAX model helicopter.  (Wassmuth Aff. ¶ 3.)

Superior Helicopters flies K-MAX model helicopters that it has, in some instances, purchased and, in others, leased from Kaman.  (Wassmuth Aff. ¶ 4.)

Kaman has leased and/or sold to Superior nine K-MAX helicopters over time.  (Wassmuth Aff. ¶ 5.)

Superior Helicopters uses the K-MAX helicopters to lift heavy loads,

---

[1] "K-MAX Helicopter N314KA" is the helicopter at issue in this case, also referred to as "helicopter serial number 015" or "Helicopter," infra.

such as logs, to support logging.  (Wassmuth Aff. ¶ 6.)

One of Superior's K-MAX helicopters, serial number 017, crashed and was destroyed on July 11, 2000.  (Wassmuth Aff. ¶ 7.)

Superior Helicopters, LLC and Kaman entered into negotiations to lease K-MAX helicopter serial number 015 ("helicopter serial number 015" or "Helicopter"), which is the subject of the pending litigation, to Superior. (Wassmuth Aff. ¶ 8.) Kaman employee, Roger Wassmuth, participated in the negotiations, during which Superior requested revisions to portions of the lease.  As a result of those requests, two versions of the lease were sent to Superior for its review.  (Wassmuth Aff. ¶ 8.)  Each version of the lease for helicopter serial number 015, including the final version that was signed in June 2002, contains the same language regarding warranties and disclaimers. Each stated:

> 9.2  LIMITATION OF LIABILITY.  EXCEPT FOR THE COST OF REPAIRING OR REPLACING A PART PURSUANT TO SUBSECTION 9.1(a), KAMAN SHALL NOT BE LIABLE FOR ANY DEFECTS, EITHER LATENT OR PATENT, IN THE AIRCRAFT OR ITS PARTS. IN NO EVENT SHALL KAMAN BE LIABLE TO LESSEE OR ANY OTHER PERSON OR ORGANIZATION FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, OR EXEMPLARY DAMAGES, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE AIRCRAFT LEASED HEREUNDER, INCLUDING WITHOUT LIMITATION, ANY DAMAGES FOR DIMINUTION OF MARKET VALUE, LOSS OF USE OF THE AIRCRAFT, LOSS OF PROFITS OR OTHER FINANCIAL OR ECONOMIC LOSS, OR FOR ANY INTERRUPTION IN LESSEE'S

BUSINESS OCCASIONED BY ITS INABILITY TO USE THE
AIRCRAFT FOR ANY REASON WHATSOEVER, EVEN IF KAMAN
HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES
OR LOSSES. KAMAN SHALL NOT BE LIABLE FOR ANY DAMAGES
CLAIMED BY LESSEE OR ANY OTHER PERSON OR ENTITY
WHETHER BASED IN CONTRACT OR IN TORT.

(Wassmuth Aff. ¶ 8 and Ex. A.)

On the date the lease was signed, helicopter serial number 015 had

accumulated 3,668.8 flight hours. (Wassmuth Aff. ¶ 8.)

Superior Helicopters operated and flew helicopter serial number 015

while it was under lease from Kaman.  (Wassmuth Aff. ¶ 9.)

Superior Leasing, LLC purchased K-MAX helicopter serial number 015

from Kaman Aerospace Corporation pursuant to a written contract titled

"Aircraft Sale Agreement" and dated November 13, 2002. (Wassmuth Aff. ¶

10 & Ex. B Aircraft Sale Agreement, Ex. C Certificate of Inspection and

Acceptance.)

Section 4A.1(b) of the Aircraft Sale Agreement provides:

4A.1  Limited Warranties.  Kaman warrants to Buyer that:
. . . .
(b) On the date of the Certificate of Inspection and Acceptance
the aircraft will be sold "as is where is", however in this case, we
will warrant the following aircraft systems (excluding the
engine); rotor components . . . to be free of defects in material
and workmanship under normal use and service conditions, for
a period of 1 year or 500 hours after delivery, whichever occurs
first. We will repair or replace nonconforming components
pursuant to that warranty. . . .

(Wassmuth Aff. ¶ 11 and Ex. B Aircraft Sale Agreement, page 3.)

Section 4A.5 of the Aircraft Sale Agreement reads in its entirety as

follows:

> 4A.5  <u>NO OTHER WARRANTIES</u>.  OTHER THAN THE LIMITED
> WARRANTIES CONTAINED IN THIS SECTION 4A, KAMAN MAKES
> NO REPRESENTATIONS OR WARRANTIES OF ANY KIND WITH
> RESPECT TO THE AIRCRAFT AND ITS COMPONENT PARTS, AND
> HEREBY DISCLAIMS ALL OTHER WARRANTIES WHETHER
> EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT
> LIMITED TO:  (I) THE CONDITION, OPERATION, FITNESS FOR
> USE OR MERCHANTABILITY OF THE AIRCRAFT; (ii) THE
> FITNESS OF THE AIRCRAFT FOR ANY PARTICULAR PURPOSE;
> (iii) THE AIRWORTHINESS OF THE AIRCRAFT SUBSEQUENT TO
> DELIVERY; OR (iv) ANY OTHER MATTER WHATSOEVER. NO
> VERBAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY
> KAMAN, ITS AGENTS AND EMPLOYEES OR ANY THIRD PARTY
> SHALL CREATE A WARRANTY AND BUYER MAY NOT RELY UPON
> ANY SUCH INFORMATION OR ADVICE AS A WARRANTY.  NO
> AGREEMENT  VARYING  OR  EXTENDING  THE  LIMITED
> WARRANTIES OR REMEDIES OF THIS SECTION 4A WILL BE
> BINDING UPON KAMAN UNLESS IN WRITING AND SIGNED BY
> A  DULY  AUTHORIZED  OFFICER  OF  KAMAN.    BUYER
> ACKNOWLEDGES THAT THE AIRCRAFT IS NOT NEW AND IS
> BEING SOLD IN "AS IS, WHERE IS" CONDITION.

(Wassmuth Aff. ¶ 12 and Ex. B Aircraft Sale Agreement, page 4.)

Section 4B of the Aircraft Sale Agreement reads in its entirety as

follows:

> 4B.1  <u>LIMITATION OF LIABILITY</u>.  EXCEPT FOR THE COST OF
> REPAIRING OR REPLACING A PART PURSUANT TO SUBSECTION
> 4A.2 OR 4A.3, KAMAN SHALL NOT BE LIABLE FOR ANY
> DEFECTS, EITHER LATENT OR PATENT, IN THE AIRCRAFT OR
> ITS PARTS.  IN NO EVENT SHALL KAMAN BE LIABLE TO BUYER

OR ANY OTHER PERSON OR ORGANIZATION FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE AIRCRAFT PURCHASED HEREUNDER, INCLUDING WITHOUT LIMITATION, ANY DAMAGES FOR DIMINUTION OF MARKET VALUE, LOSS OF USE OF THE AIRCRAFT, LOSS OF PROFITS OR OTHER FINANCIAL OR ECONOMIC LOSS, OR FOR ANY INTERRUPTION IN BUYER'S BUSINESS OCCASIONED BY ITS INABILITY TO USE THE AIRCRAFT FOR ANY REASON WHATSOEVER, EVEN IF BUYER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES. KAMAN SHALL NOT BE LIABLE FOR ANY DAMAGES CLAIMED BY BUYER OR ANY OTHER PERSON OR ENTITY WHETHER BASED IN CONTRACT OR IN TORT. BUYER ACKNOWLEDGES THAT THE AIRCRAFT IS NOT NEW AND IS BEING SOLD IN "AS IS, WHERE IS" CONDITION.

(Wassmuth Aff. ¶ 13 and Ex. B Aircraft Sale Agreement, page 5.)

Section 8.1 of the Aircraft Sale Agreement provides:

8.1  Governing Law. This Agreement shall be governed by and construed in accordance with the applicable laws in the State of Connecticut, exclusive of its choice of law rules.  Any and all disputes, claims, actions, suits, or proceedings arising out of or relating to this Agreement shall be brought exclusively in a federal or state court of competent jurisdiction established or sitting in the State of Connecticut.
 . . .

(Wassmuth Aff. ¶ 14 and Ex. B Aircraft Sale Agreement, page 6.)

Superior Leasing, Superior Helicopters, and Kaman are all commercial entities.  (Compl. ¶¶ 1, 2, 4.)

Superior purchased insurance from co-plaintiff Allianz Marine and Aviation ("Allianz"), a United Kingdom insurance company.  (Compl. ¶¶ 3, 7,

8.)

For the purpose of this motion, the parties have agreed that Superior Leasing, LLC and Superior Helicopters, LLC are both deemed to be bound by the terms of the Aircraft Sale Agreement.  (Rosen Aff. ¶ 2.)

The Aircraft Sale Agreement states that the Helicopter was being sold "not new," i.e., as a used, helicopter on an "AS IS, WHERE IS" basis and subject to a limited warranty that provided a remedy for only particular parts. (Wassmuth Aff. ¶ 15 and Ex. B Aircraft Sale Agreement pp. 3-5.)

On the date of the Aircraft Sale Agreement to Superior, the Helicopter had accumulated 4,112.8 flight hours.  (Wassmuth Aff. ¶ 16.)

Awaiting payment for the Helicopter, the Bill of Sale was not executed and title did not pass from Kaman to Superior Leasing, LLC until December 27, 2002. (Wassmuth Aff. ¶ 17.)

Plaintiffs allege that on July 25, 2003, K-MAX helicopter serial number 015 was destroyed in an accident while being flown by Superior in Keller, Washington.  (Compl. ¶¶ 13, 16; Answer ¶¶ 13, 16.)  Plaintiffs allege that "the blade grip assembly" was defective, causing the accident.  (Compl. ¶¶ 23a, 26a.)  Superior alleges that the cause of the accident was the separation of one of the rotor blades from the Aircraft as a result of a fatigue crack in the blade grip assembly of the main rotor hub.  (Compl. ¶ 14).  Superior

alleges that the resulting imbalance in the main rotor assembly caused the separation and/or fracture of the remaining three main rotor blades, resulting in the loss of all lift and in the uncontrollable descent of the Helicopter into terrain at an excessive rate. (Compl. ¶ 15)

The Helicopter failed while in the State of Washington and crashed in Washington. (Mills Aff. ¶ 8).

Records show that, at the time of the accident, the Helicopter that is the subject of this litigation had accumulated 4,583.2 flight hours since manufacture. Wassmuth Aff. ¶ 18.)

Following the accident, Allianz paid Superior for the loss of the "hull" of the Helicopter, less a deductible. (Compl. ¶¶ 17, 18.) Allianz pleads that its interests are subrogated to those of Superior. (Compl. ¶¶ 9, 19.)

Plaintiffs jointly filed their Complaint for tort damages seeking repayment to the insurance company, Allianz, for the value of the Helicopter less the deductible, and to Superior for the deductible, increased insurance premiums, and "lost profits, lost business opportunities, loss of professional reputation, loss of unearned premium for the Aircraft, and lost profit commission for insurance renewal," which plaintiffs describe in the Complaint as "consequential and incidental damages." (Compl. ¶¶ 17-22).

At the time of the crash, Superior's principal place of business was in

the State of Oregon, and Superior's employee, Randall Lee Harmon, who was killed in the crash, resided in the State of Oregon.  (Mills Aff. ¶ 5, 11).

The State of Connecticut is the principal place of business of defendant Kaman. (Aug. 9, 2005, Wassmuth Aff. ¶ 4.)

The K-MAX helicopter was designed in Connecticut.  (Aug. 9, 2005, Wassmuth Aff. ¶ 5.)  K-MAX helicopters, including the Helicopter that is the subject of this lawsuit, are manufactured in Connecticut.  (Aug. 9, 2005, Wassmuth Decl. ¶ 6.)

Prior to the accident, personnel from Kaman Aerospace had visited Superior in Oregon on business related to the Helicopter on at least three occasions and had visited Superior in Oregon on other business at least six time in the last three years for other reasons.  (Mills Aff. ¶ 17).  Superior Helicopters, LLC Director of Marketing, Andrew Mills, met with Kaman personnel in Connecticut before the subject accident.  (Aug. 9, 2005, Wassmuth Aff. ¶ 12.)

Superior also regularly receives service bulletins and other materials related to its K-MAX operations in Oregon.  (Mills Aff.  ¶ 18).  All service bulletins and maintenance instructions for the subject Helicopter were drafted in Connecticut and distributed from Connecticut.  (Aug. 9, 2005, Wassmuth Aff. ¶ 7.)

Upon the purchase of the Helicopter by Superior, all terms of the lease whereby Superior previously operated the Helicopter were terminated.  (Mills Aff. ¶ 15 & Ex. A Aircraft Sale Agreement ¶ 8.4.)  Section 8.4 of the Aircraft Sale Agreement reads in full as follows:

> 8.4  <u>Entire Agreement</u>. This Agreement contains the entire agreement between the parties pertaining to this sale and supersedes all previous understandings, communications, representations, warranties, conditions or agreements, written or oral, express or implied, legal, statutory, or otherwise, on the part of either party.

The terms of the Aircraft Sale Agreement were non-negotiable, except as to price, and all terms therein, including Section 8.4 quoted above, are the original terms drafted by Kaman Aerospace with no revision by Superior. (Mills Aff. ¶ 16).

The parties' contract, the Aircraft Sale Agreement, was drafted in Connecticut, signed by Kaman's representative in Connecticut, and forwarded to Superior Leasing, LLC from Connecticut.  (Aug. 9, 2005, Wassmuth Aff. ¶ 8.)

At Superior Leasing, LLC's request and after negotiation, Kaman refunded to Superior Leasing, LLC, as part of the Aircraft Sale Agreement, $351,000 for lease payments that Superior Helicopter, LLC had made on the subject K-MAX Helicopter before its purchase by Superior Leasing, LLC from

Kaman.  This credit is set out in Section 2.la of the Aircraft Sale Agreement. (Aug. 9, 2005, Wassmuth Aff. ¶ 9.)

Thirteen (13) Superior Helicopters, LLC pilots have come to Kaman's facility in Bloomfield, Connecticut, for training between June 1996 and April 2004 on 14 occasions, which included 11 visits (with one pilot coming twice) to Bloomfield before the subject accident. (Aug. 9, 2005, Wassmuth Aff. ¶ 10.)

Sixteen (16) Superior Helicopters, LLC mechanics have come to Kaman's facility in Bloomfield, Connecticut for training between June 1996 and July 2004 on 22 occasions, which included 18 visits (with 3 mechanics coming twice each) to Bloomfield before the subject accident.  (Aug. 9, 2005, Wassmuth Aff. ¶ 11.)

At no time during either its lease operation by Superior or subsequent to its purchase by Superior has the Helicopter ever been operated in Connecticut.  (Mills Aff. ¶¶ 13, 14.)

Superior Helicopters, LLC purchased K-MAX aircraft #24 from Kaman. The sale agreement for that purchase was signed on October 7, 1997, by Gary Jantzer on behalf of Superior.  It contained 2 handwritten changes to the text of the terms of the Agreement with respect to default and familiarization courses for pilots and mechanics.  The changes were initialed

by Gary Jantzer.  (Aug. 9, 2005, Wassmuth Aff. ¶ 13.)

Superior Helicopters, LLC purchased K-MAX aircraft #16 from Kaman. The sale agreement for that purchase was signed on August 3, 2000, by Gary Jantzer on behalf of Superior. It contained 4 sets of typed changes to the text of the terms of the Agreement with respect to delivery of the helicopter, the right of alteration of the helicopter, permissible uses of the helicopter by Superior, and a restriction of the obligation of indemnification by Superior to Kaman in the event of acts of negligence or intentional misconduct of Kaman. Each change was initialed by Mr. Jantzer.  (Aug. 9, 2005, Wassmuth Aff. ¶ 14.)

Superior is the world's largest operator of K-MAX helicopters and Superior's operations are regularly featured by Kaman for promotional purposes.  (Mills Aff. ¶¶ 13, 14 & Ex. C.)

2.  <u>Legal Standard</u>

A moving party is entitled to summary judgment as a matter of law "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact . . . ." Fed. R. Civ. P. 56(c); <u>Freeman v. Oakland Unified Sch. Dist.,</u> 291 F.3d 632, 636 (9th Cir. 2002).  The court cannot weigh the evidence or determine the truth but may only determine whether there is a

genuine issue of fact.  Playboy Enters., Inc. v. Welles, 279 F.3d 796, 800 (9th

Cir. 2002).

The moving party must carry the initial burden of proof.  Celotex Corp.

v. Catrett, 477 U.S. 317, 322-24 (1986).  The moving party meets this burden

by identifying for the court portions of the record on file which demonstrate

the absence of any genuine issue of material fact.  Id.; Devereaux v. Abbey,

263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  In assessing whether a party

has met its burden, the court views the evidence in the light most favorable

to the non-moving party.  Allen v. City of Los Angeles, 66 F.3d 1052, 1056

(9th Cir. 1995).  All reasonable inferences are drawn in favor of the non-

movant.  Gibson v. County of Washoe, 290 F.3d 1175, 1180 (9th Cir. 2002),

cert. denied, 537 U.S. 1106 (2003).

If the moving party meets its burden with a properly supported motion,

the burden then shifts to the opposing party to present specific facts which

show there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); Auvil v. CBS "60

Minutes", 67 F.3d 816, 819 (9th Cir. 1995); see Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 250 & n.4 (1986).  If the moving party presents evidence

which, taken by itself, would establish the right to a directed verdict at trial,

the motion for summary judgment must be granted, in the absence of any

significant probative evidence tending to support the opposing party's theory

of the case.  THI-Hawaii, Inc. v. First Commerce Fin. Corp., 627 F.2d 991,

993-94 (9th Cir. 1980); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 290

(1968).    Conclusory  allegations,  unsupported  by  factual  material,  are

insufficient to defeat a motion for summary judgment.  Taylor v. List, 880

F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposing party must, by

affidavit or as otherwise provided by Rule 56, designate specific facts which

show there is a genuine issue for trial.  Devereaux, 263 F.3d at 1076.

3.  Analysis

        Defendant contends in its motion for summary judgment that Oregon

choice of law rules require application of Connecticut law, which was chosen

by the parties in the Aircraft Sales Agreement (ASA); all claims for damages

in tort were agreed to be waived in the ASA; in the alternative, if the Court

does  not  dismiss  plaintiffs'  tort  claims,  all  claims  for  damages  beyond  the

costs  of  repairing  or  replacing  the  allegedly  defective  part  should  be

dismissed; and in the alternative, plaintiffs' third claim should be dismissed

because  plaintiffs  have  no  private  right  of  action  for  breach  of  a  statutory

duty under the Federal Aviation Act.  Plaintiffs respond that Connecticut law

does not apply to this action, but that Oregon and Washington law supports

plaintiffs'  recovery  in  tort,  Connecticut's  law  is  unsettled  and  internally

inconsistent,  and  a  Connecticut  court  would  apply  either  Oregon  or

Washington law; plaintiffs have stated a claim for breach of a statutory duty a/k/a negligence per se; and plaintiffs seek recovery for breach of post-sale duty to warn. Defendant replies that the ASA bars plaintiffs' claims because commercial parties are entitled to enforcement of a clear waiver of tort liability that is contained in a contract, and the Court should uphold the parties' contract. Defendant replies that plaintiffs' negligence per se claim and post-sale duty to warn claims are barred by the ASA.

Plaintiffs, in their motion for partial summary judgment, seek a ruling that "Superior may maintain its tort claims against Kaman (Complaint, Counts I-IV) under the law of Oregon, or alternatively, Washington, for damages arising out of the helicopter accident that is the subject of this action." (Pls. Cross-Mot. at 2.) In support of their motion, plaintiffs contend that Connecticut law does not apply to this action. Plaintiffs contend that Oregon and Washington law supports plaintiffs' recovery in tort, Connecticut's law is unsettled and internally inconsistent, and a Connecticut court would apply either Oregon or Washington law. Defendant objects to plaintiffs' cross-motion for summary judgment, arguing that plaintiffs fail to present an issue that may be summarily adjudicated, but that they seek an advisory opinion and, therefore, their motion should be denied. It argues that plaintiffs attempt to preempt a motion that has not been filed or briefed and the courts

do not issue advisory opinions.  Defendant also contends that, even in tort,

plaintiffs' claims fail because Oregon choice of law rules enforce the ASA's

choice of Connecticut law, Oregon's choice of law rules for torts yields the

choice of Connecticut substantive law, and Connecticut has the most

significant relationship to the claims asserted by plaintiffs; and plaintiffs'

commercial loss claims fail under Connecticut law.  Plaintiffs reply that they

are not seeking an advisory opinion and the Court may properly decide their

cross motion for partial summary judgment because deciding these issues

now is procedurally proper and efficient, citing Federal Rules of Civil

Procedure 56(a).  Plaintiffs also contend that the relevant choice of law clause

does not apply to their claims in tort; Oregon has the greatest interest in the

outcome of this action; and, if the Court determines that Connecticut law

applies, Connecticut law allows for the recovery of the value of the helicopter

itself.

        When the question of choice of law is at issue,

        A federal court sitting in diversity applies the substantive
        law of the forum state, including the forum state's choice of law
        rules, Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 []
        (1941), as it believes the highest court of the state would apply
        it, Jones-Hamilton Co. v. Beazer Materials & Services, Inc., 973
        F.2d 688, 692 (9th Cir. 1992).

Konecranes, Inc. v. Sinclair, 340 F. Supp.2d 1126, 1129-30 (D. Or. 2004);

Boydstun Metal Works, Inc. v. Parametric Tech. Corp., No. CIV. 99-480-AS,
1999 WL 476265, at *3 (D. Or. May 19, 1999).

Citing ORS 81.120 and Young v. Mobil Oil Corp., 85 Or. App. 64
(1987), and relying on the ASA between the parties, defendant argues that,
under Oregon choice of law rules, Connecticut law applies to this case. In its
supplemental briefing, defendant contends that this action is properly
characterized as one sounding in contract and not tort because plaintiffs
agreed by contract to waive any recovery in tort and, therefore, choice of law
must be determined under ORS 81.120. Plaintiffs argue that, in addressing
choice of law in the ASA, defendant chose to limit the application of
Connecticut law to issues of contract interpretation, whereas defendant
addressed claims and disputes arising out of or related to the contract only
with respect to choice of forum. Plaintiffs argue that, under Oregon's
"significant relationship" choice of law analysis, Oregon has the most
significant relationship with this action, Washington has a somewhat lesser
interest, and Connecticut has the least interest. Plaintiffs also contend that,
because Oregon and Washington would permit them to proceed under its tort
theories, there is a "false conflict" and, therefore, Oregon law applies.

ORS 81.120, contained in Chapter 81 "Tender and Receipts; Choice of
Law for Contracts," provides that, except as otherwise provided by certain

statutes, "the contractual rights and duties of the parties are governed by the law or laws that the parties have chosen," and may extend to the entire contract or to part of a contract.  In <u>Young</u>,  85 Or. App. at 67, a contract case, the court held that the parties may choose the law that is to govern their contracts, citing the Restatement (Second) Conflict of Laws § 187 (1971) (Restatement).[2]

The ASA § 8.1 provides in pertinent part:

8.1 <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the applicable laws in the State of Connecticut, exclusive of its choice of law rules.  Any and all disputes, claims, actions, suits, or proceedings arising out of or relating to this Agreement shall be brought exclusively in a federal or state court of competent jurisdiction established or sitting in the State of Connecticut. . . .

(Wassmuth Aff. Ex. B at 6.)[3]  Defendant asserts that the ASA defines the relationship between the parties in both contract--referencing the ASA § 4A, and tort--referencing the ASA § 4B--and, thus, Connecticut law governs the dispute between the parties.  Plaintiffs contend that even Connecticut would not extend § 8.1's choice of law clause to tort claims, citing <u>Greystone Community Reinvestment Associates, Inc. v. First Union National Bank</u>, No.

---

[2]  The Restatement § 187 provides in pertinent part that, with two exceptions, "The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . ."

[3]  The parties have waived the choice of forum clause.

CIV.A.NO.300CV871CFD, 2002 WL 229901 (D. Conn. Jan. 25, 2002), for the proposition that narrowly drawn choice-of-law provisions in a contract do not preclude tort causes of action under the laws of another state.  Defendant responds that <u>Greystone</u> also provides that, "'enforcement of a broadly-worded choice-of-law provision may govern interpretation of the contract and tort claims arising out of the contract.'"  (Def. Resp. at 6, quoting <u>Greystone</u>, 2002 WL 229901, at *1.)  Defendant asserts that the words of § 8.1 are clear and the provision is broad and should be enforced.

Initially, the Court finds that, despite defendant's arguments to the contrary, the nature of the choice of law issue before it is one in tort rather than contract.  <u>See</u> <u>Comind, Companhia de Seguros v. Sikorsky Aircraft Div. of United Techs. Corp.</u>, 116 F.R.D. 397, 409-16, 417-20, 421-22 (D. Conn. 1987).  Accordingly, the Court will consider the issue of whether the ASA choice of law clause governs plaintiffs' tort claims.

In considering tort claims, the Ninth Circuit has stated that, "Claims arising in tort are not ordinarily controlled by a contractual choice of law provision," but "are decided according to the law of the forum state."[4]  <u>Sutter</u>

---

[4]  The <u>Sutter Home Winery</u> court also stated with reference to counterclaims other than the counterclaim under the Arizona Spiritous Liquor Franchise Act:  "A contractual choice of law analysis is irrelevant to the resolution of these other counterclaims."  <u>Sutter Home Winery, Inc. v. Vintage Selections, Ltd.</u>, 971 F.2d 401, 407 (9th Cir. 1992) (citing <u>Consolidated Data Terminals v. Applied Digital Data Sys.</u>, 708 F.2d 385, 390 n.3

Home Winery, Inc. v. Vintage Selections, Ltd., 971 F.2d 401, 407 (9th Cir.

1992) (citing Consolidated Data Terminals v. Applied Digital Data Sys., Inc.,

708 F.2d 385, 390 n.3 (9th Cir. 1983)).  In Sutter, the contractual choice of

law provision provided:  "Except as otherwise required by applicable law, this

Agreement shall be governed by the law of the State of California."  Sutter

Home Winery, 971 F.2d at 406.

       In Consolidated Data Terminals, the choice of law provision at issue

"specified that New York law would govern the agreement."  Consolidated

Data Terminals, 708 F.2d at 388.  The Consolidated Data Terminals court, in

determining what law applied to the various issues in the diversity case,

determined that, under the forum choice of law rules, "the intention of the

parties to apply New York law to the contract would be permitted to govern;

therefore, we apply New York law to all of the contract issues in this case."

Id. at 390 n.3.  The court went on to determine that, "Other issues in this

case, which involve tort law and the law of punitive damages, are not

controlled by the contract choice of law provision."  Id.  The Consolidated

Data Terminals court also determined that the district court correctly

concluded that, under the forum law, California law should govern all non-

contractual issues in the case.  Id.

_____

(9th Cir. 1983)).

In <u>Boydstun Metal Works</u>, the district court of Oregon found that the fraud claims at issue were non-contractual and the choice of law provision in the contract between the parties did not apply to the fraud claims. The court applied Oregon's choice of law rules under the Restatement § 145 to determine the law applicable to the fraud claims. 1999 WL 476265, at *4-*5.

In <u>Greystone</u>, a Connecticut case, plaintiff sought to amend its complaint to state a claim under the Connecticut Unfair Trade Practices Act (CUTPA). Defendant there argued that amendment would be futile because, in part, plaintiff improperly pleaded a CUTPA claim when the confidentiality agreement at issue in the case contained a New York choice-of-law provision. The <u>Greystone</u> court stated that, "enforcement of a broadly-worded choice-of-law provision may govern interpretation of the contract and tort claims arising out of the contract, thus warranting dismissal of the CUTPA claims." <u>Greystone</u>, 2002 WL 229901, at *2 (citing <u>BRM Indus., Inc. v. Mazak Corp.</u>, 54 F. Supp.2d 131, 133 (D. Conn. 1999); <u>Travel Servs. Network, Inc. v. Presidential Fin. Corp.</u>, 959 F. Supp. 135, 146 (D. Conn. 1997)). The court went on to state that, "However, a narrow choice-of-law provision may not apply to related non-contract claims, a result which would permit CUTPA claims based on those allegations." <u>Greystone</u>, 2002 WL 229901, at *2 (citing <u>Messler v. Barnes Group, Inc.</u>, No. CV 960560004, 1999 WL 61034, at

*9-*10 (Conn. Super. Ct. Feb. 1, 1999)).  In <u>Greystone</u>, the confidentiality agreement between the parties provided that, "the agreement 'shall be governed and construed in accordance with the laws of the State of New York.'"  <u>Greystone</u>, 2002 WL 229901, at *2.  The <u>Greystone</u> court found that, given that the CUTPA  claims appeared to be based on its tort claims as well as breach of contract claims, "the Court cannot conclude at this time that the plaintiff has failed to state a claim under CUTPA."  <u>Id</u>.

This Court concludes that, despite defendant's argument to the contrary, under pertinent law, § 8.1 of the ASA which provides in pertinent part  that, "This Agreement shall be governed by and construed in accordance with the applicable laws in the State of Connecticut,"  would be construed as a narrow choice-of-law provision which does not apply to related non-contract claims.

Under applicable law, the Court finds that the parties' choice of law provision in the ASA governs only contract claims and does not govern plaintiffs' tort claims.  Accordingly, Oregon's choice of law rules applicable to tort claims should be applied to determine which state's substantive law will apply to plaintiffs' tort claims.

On choice of law issues, Oregon applies a two-step analysis, <u>Frosty v. Textron, Inc.</u>, 891 F. Supp. 551, 556 (D. Or. 1995):

Under Oregon law, the court must determine whether there is an actual conflict of law on the disputed issue; if not, Oregon law applies. <u>Cropp v. Interstate Distrib. Co.</u>, 129 Or. App. 510 515-16 [] (dissenting opinion), <u>rev. denied</u>, 320 Or. 407 [] (1994). Next, the court must determine whether both states have substantial interests in having their laws applied. If not, there is no choice of law issue, and the court applies the law of the one state with substantial interests. <u>Dabbs v. Silver Eagle Mfg. Co.</u>, 98 Or. App. 581, 583-84 [], <u>rev. denied</u>, 308 Or. 608 [] (1989). If both states have substantial interests, the Oregon Supreme Court has adopted the "most significant relationship" approach of the Restatement (Second) Conflicts of Law [sic]. <u>Erwin v. Thomas</u>, 264 Or. 454, 456 [] (1973).

<u>Rice v. United Parcel Serv. Gen. Servs. Co.</u>, 43 F. Supp.2d 1134, 1140-41 (D. Or. 1999).

The "most significant relationship" rule as set out in the Restatement applies to tort actions.[5] <u>Casey v. Manson Constr. & Eng'g Co.</u>, 247 Or. 274,

---

[5] The Restatement is not the law of Oregon; however, the Restatement provides guidelines to Oregon courts in resolving choice of law issues. <u>Frosty</u>, 891 F. Supp. at 557 n.4; <u>Boydstun</u>, 1999 WL 476265, at *3 n.1; <u>see</u> <u>Summers v. Interstate Tractor & Equip. Co.</u>, 466 F.2d 42, 47 (9th Cir. 1972). The Restatement § 145, entitled "The General Principle," provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance

287-88 (1967); <u>Erwin v. Thomas</u>, 264 Or. 454, 455-56 (1973); <u>Boydstun</u>

<u>Metal Works</u>, 1999 WL 476265, at *3.  "Under that rule [of most significant

relationship], the place of injury is not necessarily determinative of the

substantive law which will be applied in a tort action.  Rather, the court is to

apply the 'local law of the state which has the most significant relationship

with the occurrence and with the parties.'" <u>Boydstun Metal Works</u>, 1999 WL

476265, at *3 (quoting <u>Casey</u>, 247 Or. at 278); <u>see</u> Restatement § 147 (injury

to tangible things).

> The courts consider a number of factors in determining which
> state has the most significant relationship with the occurrence
> and the parties:  1) the place where the injury occurred; 2) the
> place where the tortious conduct occurred; 3) the domicile,
> nationality, place of incorporation, and place of business of the
> parties; and 4) the place where the relationship, if any, between
> the parties is centered.

───────────────────────

with respect to the particular issue.
The Restatement § 6, entitled "Choice-of-Law Principles," provides:
>    (1) A court, subject to constitutional restrictions, will follow a statutory
>    directive of its own state on choice of law.
>    (2) When there is no such directive, the factors relevant to the choice of
>    the applicable rule of law include
>>        (a) the needs of the interstate and international systems,
>>        (b) the relevant policies of the forum,
>>        © the relevant policies of other interested states and the
>>        relative interests of those states in the determination of the
>>        particular issue,
>>        (d) the protection of justified expectations,
>>        (e) the basic policies underlying the particular field of law,
>>        (f) certainty, predictability and uniformity of result, and
>>        (g) ease in the determination and application of the law to
>>        be applied.

W. Helicopter Servs., Inc. v. Rogerson Aircraft Corp., 728 F. Supp. 1506, 1511 (D. Or. 1990) (citing Casey, 247 Or. at 279); Curtis v. Ryder TRS, Inc., No. CIV. 98-1054-KI, 2000 WL 1474518, *2-*3 (D. Or. Oct. 4, 2000), rev'd on another ground by, 43 Fed. Appx. 103 (9th Cir. 2002); see Summers, 466 F.2d at 47-48 (citing Casey, 247 Or. 274, and applying Oregon law).

The parties seem to agree that there is no conflict between Washington and Oregon law relating to recovery in tort. However, as shown by defendant, a conflict exists between Oregon/Washington law and Connecticut as to what constitutes "harm" under the respective state's laws.

Here, the injury occurred in Washington. It appears that the fact that the Helicopter crashed in Washington is a fortuitous event. Other than this fact, there is nothing in the record to suggest that Washington has any interest in having its laws applied in this case. See Frosty, 891 F. Supp. at 556-58. Neither party argues that Washington has the most significant relationship to the occurrence and the parties.

Superior's principal place of business is in Oregon, and the parties agree that Oregon is the place where the economic loss due to the destruction of the Helicopter will be felt.[6] In this tort action, Oregon has an

---

[6] The Court agrees with plaintiffs that plaintiff Allianz, Superior's subrogated insurer, steps into the shoes of its insured, plaintiffs Superior, and, therefore, Allianz's interest in the case will be satisfied by the Court's disposition as to plaintiffs Superior.

interest in providing redress to a resident business injured by an allegedly defective product.    It is undisputed that Superior is the world's largest operator of K-MAX helicopters, and its operations are regularly featured by defendant for promotional purposes.  The record discloses that, prior to the accident, defendant's personnel had visited plaintiffs in Oregon on business related to the Helicopter on at least three occasions and had visited plaintiffs on other business at least six times in the last three years for other reasons. Plaintiffs regularly receive service bulletins and other materials related to its K-MAX operations in Oregon.[7]  It is undisputed that Superior is the world's largest operator of K-MAX helicopters, and its operations are regularly featured by defendant for promotional purposes.  Clearly, Oregon has a substantial interest in having its laws applied in this case.

Defendant's principal place of business is Connecticut.  The K-MAX Helicopter at issue was designed and manufactured in Connecticut.   In this tort action, Connecticut has an interest in regulating the conduct of parties operating in its state.  The record shows that plaintiffs' pilots and mechanics have traveled to Connecticut for training; plaintiffs' director of Marketing, Andrew Mills, met with defendant's personnel in Connecticut prior to the

---

[7] The Court does not find that the fact that the pilot resided in Oregon and was employed in Oregon--a contact asserted by plaintiffs--relevant to deciding the issue of which state's laws apply in this product liability action for property damage.

accident; and all service bulletins and maintenance instructions for the Helicopter were drafted in Connecticut and distributed from there.[8] Connecticut also has a substantial interest in having its laws apply in this case.

Of the contacts, the Court finds significant the fact that Superior, an Oregon-based company, is Kaman's largest customer of K-MAX helicopters. Also significant in this product liability case is the fact that the K-MAX helicopter was designed in Connecticut and that the K-MAX Helicopter at issue was manufactured in Connecticut.

As stated, the place where the injury occurred is Washington. The place where the alleged tortious conduct causing the injury occurred is Connecticut, where the K-MAX helicopter was designed and manufactured, allegedly in a defective and dangerous condition. See Jones ex rel. Jones v. Winnebago Indus., Inc., ___ F. Supp.2d ___, No. C 05-3042-MWB, 2006 WL 3095946, at *13 (N.D. Iowa Nov. 1, 2006) (in products liability case, the place where allegedly defective product designed, marketed, or manufactured is place where conduct causing injury occurred) (and cases cited); McLennan v. Am. Eurocopter Corp., 245 F.3d 403, 426 (5th Cir. 2001) (in strict products

_____

[8] In light of the Court's findings, supra, the Court does not find that the fact that the ASA was drafted and signed in Connecticut--a contact asserted by defendant--relevant to this product liability action for property damage.

Findings and Recommendation - Page 27

liability and negligence action against Texas helicopter manufacturer, relevant conduct–marketing and manufacturing of helicopter–took place in Texas); Rocky Mountain Helicopters, Inc. v. Bell Helicopter Textron, Inc., 24 F.3d 125, 128 (10th Cir. 1994) (alleged negligence occurred in Texas where helicopter manufactured).   Plaintiffs' principal place of business is Oregon, and defendant's is Connecticut.  As to where the parties' relationship is centered, the Court finds that this is a close question in this case.  While training of Superior's pilots and mechanics took place in Connecticut, the Court finds this less important than the fact that Superior is Kaman's largest customer. However, of paramount importance in this product liability case is the fact that the product was designed and manufactured in Connecticut. Accordingly, the Court finds that the place where the relationship between plaintiffs and defendant is centered is Connecticut, where the Helicopter was designed and manufactured.   See McLennan, 245 F.3d at 426 (where marketing and manufacture of helicopter, defendant maintained its principal place of business, defendant forwarded service letters and bulletins and maintained records in Texas, relationship centered in Texas); Rocky Mountain Helicopters, 24 F.3d at 128 (past dealings between parties centered in Texas "because Rocky Mountain orders Bell helicopters from Texas and sends them there for repair."); see also Int'l Mktg. Ltd. v. Archer Daniels Midland Co., No.

97-1328-AS, 1998 WL 1180157, at *10 (D. Or. Apr. 10, 1998) (Ashmanskas, J.) (relationship centered in Illinois "because the products at issue were to be produced and shipped from Illinois."); In re Bendectin Litig., 857 F.2d 290, 305 (6th Cir. 1988) (relationship centered in Ohio where the tortious conduct and the safety of the product were regulated).

Because it was fortuitous that the injury occurred in Washington, the other factors gain more weight. The place where the conduct occurred is given particular weight where the place of injury is fortuitous. Restatement § 145 cmt. e at 420; see Jones, ___ F. Supp.2d at ___, 2006 WL 3095946, at *13; In re Air Disaster at Ramstein Air Base, Germany, 81 F.3d 570, 577, as amended on denial of reh'g, Perez v. Lockheed Corp., 88 F.3d 340 (per curiam) (5th Cir. 1996). Further, the domicile/residence is given more weight when it is grouped with other contacts. Restatement § 145 cmt. e at 421; Jones, ___ F. Supp.2d at ___, 2006 WL 3095946, at *14. Here, Connecticut is where the conduct causing the injury occurred, Kaman's place of business is located, and where the relationship between the parties can be said to be centered.

Of the section 6 factors, only factors (a) the needs of the interstate and international systems, (d) the protection of justified expectations, and (f) certainty, predictability and uniformity of result, are discussed by the parties.

However, factors (d) and (f) are of little importance in tort cases. Restatement § 6 cmt. g at 15, § 145 cmt. b at 415-16; <u>Rosenthal v. Ford Motor Co.</u>, ___ F. Supp.2d ___, No. Civ.A. 3:05CV478 (JCH), 2006 WL 3392748 (D. Conn. Nov. 21, 2006). The Court finds that factor (a) the needs of the interstate and international systems does not change the Court's determination. On this record, the Court finds that Connecticut has the most significant relationship with the occurrence and parties, and its laws should apply to plaintiffs' tort claims.

Plaintiffs concede that, if Connecticut law applies, the Connecticut Product Liability Act (CPLA)–the exclusive remedy for claims sounding in product liability–will determine their recovery in tort. <u>See</u> <u>Mountain W. Helicopter, LLC v. Kaman Aerospace Corp.</u>, 310 F. Supp.2d 459, 463 (D. Conn. 2004) (citing Conn. Gen. Stat. §§ 52-572n(a), 52,572m(b)).

While defendant argues first that it is entitled to summary judgment on the basis of the disclaimers in the ASA, it also argues that, under the CPLA, commercial losses may not be recovered, Conn. Gen. Stat. Ann. §§ 52-572m(d), 52-572n(c); and, independently, the economic loss doctrine of <u>East River S.S. Corp. v. Transamerica Dalaval, Inc.</u>, 476 U.S. 858, 871-72 (1986), prevents plaintiffs' recovery in tort. The Court finds it necessary to discuss

the issues at this point, since a determination of either of these issues in defendant's favor could resolve  defendant's motion.

Connecticut General Statutes Annotated § 52-572n, relating to product liability claims, provides that such a claim may be asserted against product sellers "for harm caused by a product."  Conn. Gen. Stat. Ann. § 52-572n(a). In subsection (c), the statute provides:

> As between commercial parties, commercial loss caused by a product is not harm and may not be recovered by a commercial claimant in a product liability claim.  An action for commercial loss caused by a product may be brought only under, and shall be governed by, title 42a, the Uniform Commercial Code.

Connecticut General Statutes Annotated § 52-572m, relating to definitions applicable to product liability actions, provides in pertinent part that, "'Harm' includes damage to property, including the product itself, and personal injuries including wrongful death.  As between commercial parties, 'harm' does not include commercial loss."  Conn. Gen. Stat. Ann. § 52-572m(d).

While recognizing a split in the Connecticut decisions as to the definition of "commercial loss," defendant contends that the kinds of consequential and incidental damages sought by plaintiffs are not permitted. Plaintiffs contend that "commercial loss" cannot be read to include damage to the product itself–here, the Helicopter– and, at minimum, it is entitled to recover for the loss of the Helicopter itself.

In <u>Mountain West Helicopter</u>, 310 F. Supp.2d at 464-66, plaintiffs sued the manufacturer of clutches for damages based on the loss of two helicopters caused by allegedly defective clutches.  The United States District Court for the District of Connecticut considered whether the commercial loss rule of the CPLA required dismissal of plaintiffs' CPLA claims  and determined that the rule did not bar the CPLA cause of action for damages for injury to property other than the defective product.  The court found that, "inasmuch as the plaintiffs seek damages based on the loss of their helicopters, the commercial loss rule of the CPLA does not bar the CPLA cause of action."  <u>Id</u>. at 466.  The court also determined that, under the rulings of the Connecticut superior courts, there was no dispute that damages sought for "various consequential economic losses,"–not identified by the court, but apparently not related to damage to tangible property--are not permitted under the CPLA.  <u>Id.</u> 465-66 & n.4.  In making its determination, the <u>Mountain West Helicopter</u> court considered various principles gleaned from the language of Connecticut General Statues § 52-572m(d) itself, the decisions of Connecticut courts and other courts considering the issue of whether a plaintiff could maintain a product liability action for damage to property, and the distinction between purely economic losses resulting from a product failure which do not implicate the safety concerns of tort law and damage to other property which

does.  310 F. Supp.2d at 464-66.

Mountain West Helicopter concerned damage to property other than the product itself.  In this case, it is undisputed that plaintiffs allege in their complaint that "the blade grip assembly" was defective, causing the accident.[9] In addressing the issue of the definition of commercial loss in their briefing, plaintiffs contend that, applying the logic of the Mountain West Helicopter court, commercial loss cannot reasonably be read to include damage to the product itself.  Whether plaintiffs are alleging or arguing damage to the product itself or damage to property other than the product itself, i.e., the Helicopter,  this Court finds that the reasoning of Mountain West Helicopter relating to the language of the CPLA applicable in either event.

The CPLA provides that "harm" includes "damage to property, including the product itself"; it also provides that, "As between commercial parties, 'harm' does not include commercial loss."  Conn. Gen. Stat. Ann. § 52-

---

[9] Plaintiffs allege in their complaint in pertinent part:
        13.  On July 25, 2003 while operating in the vicinity of Keller, Washington, the Aircraft suffered a catastrophic main rotor blade failure.
        14.  Specifically, one of the rotor blades separated from the Aircraft as a result of a fatigue crack in the blade grip assembly of the main rotor hub.
        15.  The resulting imbalance in the main rotor assembly caused the separation and or fracture of the remaining three main rotor blades, resulting in the loss of all lift and in the incontrollable [sic] descent of the helicopter into terrain at an excessive rate.
        16.  The resulting impact with terrain and post-crash fire destroyed the helicopter and caused the death of the pilot.
(Compl. at 3.)

572m(d), <u>supra</u>.  As stated by the <u>Mountain West Helicopter</u> court:

> Thus, the second sentence excludes from the broad first
> sentence so-called commercial losses.  In other words, the
> second sentence serves as a limitation of the first sentence.
> Consequently, it would be counterintuitive to conclude that the
> limiting sentence is intended to exclude an explicit harm
> provided for in the first sentence, property damage, but that it
> employs a completely different term, commercial loss, to do so.
> Rather, the usage of two different terms in the same subsection
> militates in favor of the conclusion that the two terms have
> different meanings.  <u>See</u> <u>Plourde v. Liburdi</u>, 207 Conn. 412, 540
> A.2d 1054 ([Conn.] 1988) ("[t]he use of different words . . . in
> the context of the same subject matter must indicate a
> difference in the legislative intention").

310 F. Supp.2d at 465.  And, as pointed out by the <u>Mountain West Helicopter</u>

court, the Connecticut Supreme Court distinguishes between the statutory

term "damage to property," <u>see</u> Conn. Gen. Stat. Ann. § 52-572m(d), and

"'purely commercial losses unaccompanied by damages to or loss of the use

of some tangible property.'" 310 F. Supp. 2d at 465 (citing <u>Williams Ford, Inc.</u>

<u>v. Hartford Courant Co.</u>, 232 Conn. 559, 581 (1995).  The court found that

the Connecticut Supreme Court has, in the context of other statutes,

recognized a categorical distinction between commercial losses and damage

to property, so that it would be consistent to treat the terms, "property

damage" and "commercial loss" as distinct concepts.  <u>Mountain W. Helicopter</u>,

310 F. Supp.2d at 465.  Accordingly, the Court finds that, under the language

of the CPLA, the so-called commercial loss rule does not prevent recovery by

plaintiffs for the loss of the Helicopter.    See Conn. Gen. Stat. Ann. § 52-572m(d); Mountain W. Helicopter, 310 F. Supp.2d at 464-66; see also McKernan v. United Techs. Corp. v. Sikorsky Aircraft Div., 717 F. Supp. 60, 65-66 & n.5 (D. Conn. 1989) (losses for diminished capability of helicopter such as diminished proceeds upon resale and loss of income during downtime required for modification were "solely commercial losses" which could be brought only under the Uniform Commercial Code; no reference in complaint to property damage sustained by helicopter); Conn. Gen. Life Ins. Co. v. Grodsky Serv., Inc., 781 F. Supp. 897, 899-901 (D. Conn. 1991) ("commercial loss" includes all economic loss, direct or consequential, "though possibly not physical property damage and damage to the product itself") (and cases cited).[10]

To the extent that the economic loss doctrine of East River, 476 U.S. 858, an admiralty case, applies to this case, the Court finds, like the court in Comind, Companhia de Seguros v. Sikorsky Aircraft Div. of United Techs. Corp., 116 F.R.D. 397, 416-17, 423-24 & nn.1 & 2 (D. Conn. 1987), that the doctrine does not preclude plaintiffs' tort claims in the circumstances shown

[10] Plaintiffs concede in their supplemental briefing that, under the CPLA, consequential damages "such as lost profits, pilot training, etc." would be deemed commercial losses as to which the disclaimers would be effective.  (Pls. Suppl. Brief at 8.)  The Court need not decide that issue at this time.

in the record.  Here, defendant does not contest plaintiffs' allegation and representation in the briefing that the pilot of the Helicopter died when the Helicopter crashed.  (See Mills Aff. ¶¶4, 9.)    Further, for the same reasons that the commercial loss rule of the CPLA does not apply to the circumstances of this case, neither does the economic loss doctrine.  "The economic loss rule, similar to the commercial loss rule of the CPLA, generally bars a plaintiff from seeking so-called economic damages, i.e., lost profits, by way of tort law." Mountain W. Helicopter, 310 F. Supp.2d at 467.  In East River, the United States Supreme Court addressed a situation where the alleged defective product, turbine components, damaged the turbines and caused supertankers in which they were installed to malfunction.  The Court noted that in traditional property damage cases, the defective product damages other property.  E. River, 476 U.S. at 867  The Court found that damage to a product itself had certain attributes of a products liability claim, but distinguished the injury suffered–failure of the product to function properly–as being the essence of a warranty action, through which a contracting party can seek to recoup the benefit of the bargain.  Id. at 872. The Court stated that damage to a product itself is understood as a warranty claim and "Recovery on a warranty theory would give the charterers their repair costs and lost profits, and would place them in the position they would

have been in had the turbines functioned properly." The Court noted in

contrast, that tort damages generally compensate a plaintiff for loss and

return plaintiff to the position he occupied before the injury. 476 U.S. at 873-

74 & n. 9. In the circumstances here, where it is alleged that a defective

blade grip assembly of the main rotor hub caused the crash and destruction

of other property–the Helicopter–are not like a warranty claim for repair costs

and lost profits.

In considering defendant's argument that it is entitled to summary

judgment because the disclaimers in the ASA disclaims any liability in tort, the

Court will look to Connecticut's substantive tort law in deciding whether tort

liability has been effectively disclaimed by defendant. See Comind, 116

F.R.D. at 418, 419 (CPLA does not provide substantive rules regarding

whether negligence or strict liability disclaimers are valid or enforceable).

Defendant relies on the following disclaimer language found in the ASA:

> KAMAN SHALL NOT BE LIABLE FOR ANY DAMAGES CLAIMED BY
>
> BUYER . . . WHETHER BASED IN CONTRACT OR IN TORT.

(Wassmuth Aff. ¶ 13 and Ex. B Aircraft Sale Agreement, page 5.) That

language appears in Section 4B of the ASA and reads in its entirety as

follows:

 4B.1 <u>LIMITATION OF LIABILITY</u>.  EXCEPT FOR THE COST OF REPAIRING OR REPLACING A PART PURSUANT TO SUBSECTION 4A.2 OR 4A.3, KAMAN SHALL NOT BE LIABLE FOR ANY DEFECTS, EITHER LATENT OR PATENT, IN THE AIRCRAFT OR ITS PARTS.  IN NO EVENT SHALL KAMAN BE LIABLE TO BUYER OR ANY OTHER PERSON OR ORGANIZATION FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE AIRCRAFT PURCHASED HEREUNDER, INCLUDING WITHOUT LIMITATION, ANY DAMAGES FOR DIMINUTION OF MARKET VALUE, LOSS OF USE OF THE AIRCRAFT, LOSS OF PROFITS OR OTHER FINANCIAL OR ECONOMIC LOSS, OR FOR ANY INTERRUPTION IN BUYER'S BUSINESS OCCASIONED BY ITS INABILITY TO USE THE AIRCRAFT FOR ANY REASON WHATSOEVER, EVEN IF BUYER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES. KAMAN SHALL NOT BE LIABLE FOR ANY DAMAGES CLAIMED BY BUYER OR ANY OTHER PERSON OR ENTITY WHETHER BASED IN CONTRACT OR IN TORT.  BUYER ACKNOWLEDGES THAT THE AIRCRAFT IS NOT NEW AND IS BEING SOLD IN "AS IS, WHERE IS" CONDITION.

(Wassmuth Aff. ¶ 13 and Ex. B Aircraft Sale Agreement, page 5.)

 As to plaintiffs' claim for strict product liability, the Court finds that any disclaimer for liability in tort contained in the ASA is ineffective to disclaim liability for strict product liability.  As the court in <u>Comind</u> explained:  "strict products liability is entirely independent from any liability or allocation of risk created by contract and is not governed by contractual creations." 116 F.R.D. at 420 (citing Connecticut Supreme Court case, <u>Rossignol v. Dansbury Sch. of Aeronautics, Inc.</u>, 154 Conn. 549, 559-60 (Conn. 1967)).  The <u>Comind</u> court pointed out that, historically, the strict products liability doctrine has

been applied to commercial parties in Connecticut unchanged from its non-commercial context.  Comind, 116 F.R.D. at 420 (citing Coe-Park Donuts, Inc. v. Robertshaw Controls Co., 1 Conn. App. 84, 86 (Conn. App. 1983).  Here, the Court has found, supra, that the "commercial loss" rule of Connecticut General Statutes Annotated § 52-572n(c) does not apply in the circumstances of this case and, accordingly,  the reasoning of the Comind court applies equally to plaintiffs' strict liability claim.  Defendant's motion for summary judgment should be denied to the extent it argues that contractual disclaimers bars plaintiffs' recovery in strict products liability.

As to plaintiffs' negligence claims, which includes plaintiffs' claims for breach of statutory duty / negligence per se and duty to warn for purposes of defendant's motion,[11] Connecticut law strongly disfavors disclaimers of negligence.  Comind, 116 F.R.D. at 419-20 (and cases cited).  Cases in which the validity of negligence disclaimers are challenged are considered on a

_____

[11] As an alternative ground for summary judgment, defendant contends that plaintiffs' third count for breach of statutory duty should be dismissed because there is no private right of action under the Federal Aviation Act.  Plaintiffs respond that its claim is one for negligence per se; it contends that Oregon and Connecticut courts have considered such claims seeking damages for violation of the Federal Aviation Act as negligence per se.  In reply, defendant contends only that plaintiffs' negligence per se claim and post-sale duty to warn claims are barred by the ASA, Section 4B.1. Accordingly, the Court understands from defendant's reply that it is abandoning its alternative ground for summary judgment as to plaintiffs' third claim, and that it seeks summary judgment as to plaintiffs' third and fourth claims on the ground that all tort claims are barred by the contractual disclaimers.

case-by-case basis.  Id. (and cases cited).  In a case where a septic system was negligently installed, the Connecticut court found that a party cannot by contract relieve himself of negligence liability.  Rodriguez v. Gilbertie, 33 Conn. Supp. 583, 584-85 (Conn. App. 1976); Griffin v. Nationwide Moving & Storage Co., 187 Conn. 405, 413 (Conn. 1982) ("The law does not favor contract provisions which relieve a person from his own negligence.")  In Griffin, a bailment case relied upon by defendant in support of its argument that the contractual disclaimer bars liability for damages "in tort," the Connecticut Supreme Court stated that it had held that "the right of a bailee to limit his liability by special contract does not extend to relieve him wholly against his own negligence, for to do so would be against public policy." Griffin, 187 Conn. at 413 (and case cited).  The closest case factually to the instant case is Comind, 116 F.R.D. 397, which involved similar claims based on similar facts.  Defendant's cases in support of its position are not on point. While the case of Leon's Bakery, Inc. v. Grinnell Corp., 990 F.2d 44 (2d Cir. 1993), was between commercial parties, the Leon's Bakery court itself distinguished the facts before it from those in Comind, finding Comind inapposite.  Leon's Bakery concerned property damage resulting from the failure of a fire detection and sprinkler system.  990 F.2d at 45-46.  The Leon's Bakery court stated:

> Though the <u>Comind</u> court may have drawn the correct inference as to how the Connecticut Supreme Court would treat a limitation-of-liability clause in an action to recover for losses sustained in an event that was caused by the device defectively manufactured by the defendant, we think the district court in the present case property inferred that the Connecticut courts would treat a limitation-of-liability clause in a fire alarm case differently. A fire alarm, though designed to detect the presence of fire, and thereby to limit the damage caused by the fire, is not itself the cause of the event or the agent of harm. Thus, a fire alarm is less like the <u>Comind</u> helicopter, which itself was the cause of the crash, than it is like the burglar alarm in <u>Hanover Insurance Co. v. American District Telegraph Co.</u>, 5 Conn.L.Rptr. 324 [(Conn. Super Ct. 1991)], which did not cause the burglary but allegedly failed to result in an appropriate response by the monitor to the presence of the burglar.

<u>Leon's Bakery</u>, 990 F.2d at 49. Like the <u>Comind</u> court, this Court finds that it cannot say as a matter of law that the disclaimer of tort liability is enforceable as a matter of law. Resolution of the issue should await further factual development. See <u>Comind</u>, 116 F.R.D. at 420. Defendant's motion for summary judgment should be denied to the extent it argues that contractual disclaimers bars plaintiffs' recovery in negligence.

As an alternative ground for summary judgment, defendant argues that, if the Court does not dismiss plaintiffs' tort claims, it should dismiss all claims for damages beyond the cost of repairing or replacing the allegedly defective system. In support of its contention, defendant recites provisions of the Connecticut Uniform Commercial Code (UCC) and argues that the

Findings and Recommendation - Page 41

warranty disclaimer of Section 4A.5 of the ASA and the limitation of liabilities provision of Section 4B.1 bar damages.

Defendant's arguments and the Connecticut UCC provisions and cases cited concern breach of warranty claims.  See Comind, 116 F.R.D. at 409-16 (describing a similar contractual provision as "a classic repair or replacement warranty").  A warranty claim is in contract, and plaintiffs have not alleged any contract claim in their complaint.  Further, the Court has found that the "commercial loss" rule of Connecticut General Statutes Annotated § 52-572n(c)--which would limit recovery to the provisions of the UCC Title 42a--does not apply in the circumstances of this case, see supra.  The Court finds that, on the basis of the tort claims alleged in plaintiffs' complaint, defendant's repair or replacement limitation is inapplicable.  Defendant's motion for summary judgment on this ground should be denied.

The Court recommends that defendant's motion for summary judgment be denied.  In their cross-motion for partial summary judgment, plaintiffs seek a ruling that "Superior may maintain its tort claims against Kaman (Complaint, Counts I-IV) under the law of Oregon, or alternatively, Washington, for damages arising out of the helicopter accident that is the subject of this action."  (Pls. Cross-Mot. at 2.)

Federal Rules of Civil Procedure 56(a) provides in pertinent part: "A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may . . . move with or without supporting affidavits for a summary judgment in the party's favor upon all <u>or any part thereof</u>." (Emphasis added.) Whether individual issues, other than adjudication of liability which is expressly provided by Rule 56(c), within a claim or defense may be adjudicated before trial is unclear. The Rutter Group, Federal Civil Procedure Before Trial § 14.40-14.47; <u>see</u> <u>Advanced Semiconductor Materials Am., Inc. v. Applied Materials, Inc.</u>, No. C-93-20853 RMW, 1995 WL 419747, at *2-*4 (N.D. Cal. July 10, 1995) (and cases and authorities cited).

In addressing defendant's motion, the Court considered the issue of what law applies to plaintiffs' tort claims, finding that Connecticut law applies, and recommends denial of defendant's motion on the merits of its arguments. The Court did so on the basis of all briefs submitted by the parties, including plaintiffs' summary judgment submissions. Thus, resolution of the issues plaintiffs seek answers to in its motion does not constitute an advisory opinion. It appears that the reasonable inference from the recommended denial of defendant's motion as to all of plaintiffs' tort claims on the bases asserted answers the questions as to which plaintiffs seek

partial adjudication.  On the other hand, plaintiffs have filed a motion, and it seems that the preliminary issue of what law applies to the complaint, which advances only tort claims, would be helpful to the parties in litigating this case.  The Court finds no harm in allowing plaintiffs' motion for summary judgment.    Accordingly, plaintiffs' motion for summary judgment on the ground that it may proceed on its tort claims is granted, and plaintiffs' motion for summary judgment on the ground that the law of Oregon or Washington applies to its tort claims is denied.


**B.  Plaintiffs' motion to amend**

Following the parties' submissions of supplemental briefing on the cross-motions for summary judgment, plaintiffs filed a motion to amend the complaint.  Plaintiffs seek to add a claim of frustration of purpose.  Defendant opposes plaintiffs' motion on the grounds of futility, delay, and prejudice. Plaintiffs reply that defendant fails to set forth any facts to suggest that the proposed amendment is prejudicial; there will be no delay occasioned by their proposed amendment; and defendant has  not disputed the legal sufficiency of the proposed claim.

Federal Rules of Civil Procedure 15 governs amendments to the pleadings.  It is within the court's discretion to grant or deny leave to amend.

<u>Acri v. Int'l Ass'n of Machinists</u>, 781 F.2d 1393, 1398 (9th Cir. 1986).  Leave to amend should be freely given unless the opposing party makes a showing of undue prejudice, bad faith, or dilatory motive on the part of the moving party.  <u>See</u> <u>Martinez v. Newport Beach City</u>, 125 F.3d 777, 785 (9th Cir. 1997), <u>overruled on another ground by</u> <u>Green v. City of Tucson</u>, 255 F.3d 1086 (9th Cir. 2001).  The party opposing the amendment has the burden of demonstrating why leave to amend should not be granted.  <u>Genentech, Inc. v. Abbott Labs.</u>, 127 F.R.D. 529, 530-31 (N.D. Cal. 1989).

"The following factors guide a court's determination of whether a motion to amend should be granted: (1) undue delay; (2) bad faith; (3) futility of amendment; and (4) prejudice to the opposing party."  <u>Forsyth v. Humana, Inc.</u>, 114 F.3d 1467, 1482 (9th Cir. 1997), <u>aff'd</u>, 525 U.S. 299 (1999) (citation omitted).  The court may also consider whether the party has previously amended the complaint.  <u>DCD Programs, Ltd. v. Leighton</u>, 833 F.2d 183, 186 (9th Cir. 1987).

Bad faith can be shown by seeking to amend the complaint when the moving party is faced with a motion for summary judgment.  <u>Lockheed Martin Corp. v. Network Solutions, Inc.</u>, 194 F.3d 980, 986 (9th Cir. 1999).  Failure to offer a plausible explanation for delay may show bad faith.  <u>Owens v. Kaiser Fdn. Health Plan, Inc.</u>, 244 F.3d 708, 712 (9th Cir. 2001).  Delay is not

dispositive, but is relevant, particularly where no explanation is given for the delay.  Lockheed Martin, 194 F.3d at 986 (citing Swanson v. U.S. Forest Serv., 87 F.3d 339, 345 (9th Cir. 1996)).  "Relevant to evaluating the delay issue is whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleading."  Jackson v. Bank of Hawaii, 902 F.2d 1385, 1388 (9th Cir. 1990); Texaco, Inc. v. Ponsoldt, 939 F.2d 794, 798-99 (9th Cir. 1991).  Undue delay, by itself may be insufficient to deny a motion to amend, but, when combined with other factors, denial could be proper.  Morongo Band of Mission Indians v. Rose, 893 F.2d 1074, 1079 (9th Cir. 1990).

Futility of the proposed amendment, alone, supports denial of a motion to amend.  U. S. ex rel. Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1052 (9th Cir. 2001) (citing Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995)); Moore v. Kayport Package Express, Inc., 885 F.2d 531, 538 (9th Cir. 1989).  "[A] proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense."  Miller v. Rykoff-Sexton, Inc., 845 F.2d 209, 214 (9th Cir. 1988) ("proper test to be applied when determining the legal sufficiency of a proposed amendment is identical to the one used when considering the sufficiency of a  pleading challenged under Rule 12(b)(6).")

"Prejudice to the opposing party is the most important factor." Jackson, 902 F.2d at 1387.  "Expense, delay, and wear and tear on individuals and companies count toward prejudice." Kaplan v. Rose, 49 F.3d 1363, 1370 (9th Cir. 1994) (denying leave to amend complaint due to prejudice against defendant).  When the plaintiff is simply restating its prior claims under a new label, the defendant will be prejudiced if the motion is granted.  Fidelity Fin. Corp. v. Fed. Home Loan Bank of San Francisco, 792 F.2d 1432, 1438 (9th Cir. 1986) (leave to amend denied).

Denial of a motion to amend is appropriate when the motion is not filed until after discovery has been completed, and granting of the motion will require the reopening of discovery.  Cowen v. Bank United Of Texas, FSB, 70 F.3d 937, 944 (7th Cir. 1995).  "A need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice from a delayed motion to amend the complaint." Lockheed Martin, 194 F.3d at 986 (citing Solomon v. N. Am. Life & Cas. Inc. Co., 151 F.3d 1132, 1139 (9th Cir. 1998); McGlinchy v. Shell Chem. Co., 845 F.2d 802, 809 (9th Cir 1988).

Here, there has been some delay by plaintiffs in moving to amend their complaint.  Defendant claims prejudice but, in support, offers only an assertion that the proposed amendment will delay resolution of the pending cross-motions for summary judgment and burden it and the court with more

opposition briefs.  Defendant asserts that the proposed amendment is futile because it will not change the result of their contract or the outcome of the case because plaintiffs' demand for damages is barred by the limitation of liability provisions of the parties' contract, which are enforceable under Connecticut General Statutes § 42a-719(3).

Defendant does not demonstrate that it will be prejudiced in any real sense if the proposed amendment is allowed.  The record shows that defendant's motion for summary judgment was filed relatively early in the case, and more than four months before the close of discovery.  The Court has granted motions for extension of the discovery and related deadlines brought on the ground that, depending on the outcome of the parties' cross-motions, discovery will need to be conducted.  Defendant does not show that plaintiffs' proposed claim is futile in the sense that plaintiffs fail to state a claim, but argues that the amendment is futile based on evidence outside of the pleadings, which is insufficient to show futility.

On the record before it, the Court finds that defendant has not demonstrated either prejudice or futility.  Plaintiffs' motion for leave to amend is granted.

To the extent that plaintiffs request that the Court consider its new claim of frustration of purpose in the parties' cross-motions for summary judgment, the Court declines to do so. The summary judgment motions were addressed to plaintiffs' existing tort claims alleged in their complaint. Defendant's response to plaintiffs' introduction of any frustration of purpose claim in the summary judgment briefing was that such a claim was not part of the pleadings. Thus, the merits of plaintiff's contract claim were not addressed in the context of summary judgment.

## II. <u>ORDER</u>

Based on the foregoing, plaintiffs' motion to amend complaint (#72) is granted;  plaintiffs' amended complaint shall be filed with the Court on or before December 29, 2006.

## III. <u>RECOMMENDATION</u>

Based on the foregoing, it is recommended that defendant's motion for summary judgment (#12) be denied, and that plaintiffs' cross-motion for summary judgment  (#22) be granted in part and denied in part, as stated herein.

<u>This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals</u>.  **Any notice of**

appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. <u>The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties have ten days within which to file a response to the objections</u>. **Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.**

DATED this __19___ day of December, 2006.


_____/s/_____
UNITED STATES MAGISTRATE JUDGE